IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES PRESLEY HODGE, d/b/a
JPH OIL PRODUCERS, Individually and
on behalf of parties to the Wainoco Hodge #1
Operating Agreement dated March 4, 1998,

      Plaintiff/Counter-Defendant,

v.                                                        Civil No. 99-903 WWD/KBM

SCHLUMBERGER ANADRILL, and
SCHLUMBERGER TECHNOLOGY
CORPORATION,

      Defendants/Counter-Plaintiffs.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon a Motion by Plaintiff/Counter-Defendant ("Plaintiff" or "Hodge") for Partial Summary Judgment, filed July 25, 2000 **[docket # 40]** and Cross-Motion by Defendant for Partial Summary Judgment, filed August 9, 2000 **[docket # 51]**. Having considered all the pleadings, memoranda and other materials submitted by the parties, as well as the applicable law, I find that Plaintiff's motion is not well-taken and will be denied, and that Defendant's cross-motion is well-taken and will be granted.

### BACKGROUND[1]

This is an oil drilling contract case. Plaintiff operates JPH Oil Producers, and together with other investors, undertook the drilling of an oil and gas well known as Wainoco Hodge #1 in Lea County, New Mexico. In early 1998, JPH Oil entertained bids for the directional drilling of

---

[1] The facts set out below are presented within the parties' set of undisputed facts and supportive exhibits.

Wainoco Hodge #1.[2]  Defendants Schlumberger Anadrill, and Schlumberger Technology Corporation (collectively, "Schlumberger" or "STC") of Midland, Texas submitted a bid in February 1998, but the contract was awarded to another company, Phoenix Drilling.  Around March 12, 1998, several weeks after Phoenix Drilling commenced operations at Wainoco Hodge #1, its equipment became stuck in the wellbore, but Phoenix was able to free the equipment.  Hodge then released Phoenix from further work on the well since by this time, the drilling had progressed to a point to where JHP Oil could continue the drilling using conventional drilling methods.[3]

In late March, after several joints of pipe became stuck in the drill hole, JPH Oil decided to attempt "sidetrack" operations, which involves directional drilling in a detour around the stuck pipe.  Again, one of the companies which submitted a bid on the "sidetrack" operation was Schlumberger.  On April 7, 1998, JPH Oil Producers entered into a contract with Schlumberger to perform the "sidetrack" operations at Wainoco Hodge #1. This "sidetrack" operation started around April 9th, and continued until the end of April, when there was some concern about the location of the bottom of the hole, which was being targeted by the "sidetrack" operations.

On May 1, 1998, when an attempt was made to use survey equipment to determine the true depth and location of the hole bottom, the equipment became stuck in the hole.  Efforts to retrieve the survey equipment from the hole were unsuccessful and the equipment was eventually

---

[2] Directional drilling involves drilling at an angle, or even horizontally, and requires specialized equipment different from that used in conventional drilling.  Prior to the drilling at Wainoco Hodge #1, Plaintiff had been involved in the drilling and operations of other wells that had utilized the conventional method.

[3] The work done by Phoenix Drilling is not part of this case.

left down the hole.  Further efforts to salvage operations at Wainoco Hodge #1 were unsuccessful and financially unfeasible.  Operations were halted at the site in August 1998 and the well was abandoned.  By December 1998, Plaintiff lost the leases on Wainoco Hodge #1.

Hodge contends that drilling operations had to be shut down when the survey equipment became lodged in the hole, and equipment became lost, as a result of Defendant's negligence. Plaintiff further argues that Schlumberger can recover for the loss of any equipment under Lost in Hole coverage, and that Defendant was negligent if it failed to obtain such coverage.  See <u>Pltff's SJ Mot., Ex. 6</u>.  The complaint alleges grounds of negligence, negligent and fraudulent misrepresentation, violation of New Mexico Unfair Practices Act and breach of contract.  Plaintiff seeks damages for the loss of investments and production royalties at Wainoco Hodge #1 and also from the loss of leases on 920 contiguous acres which contain seven well prospects.  Plaintiff claims that at the time the well was abandoned, $1,500,000.00 had been invested in the project.

Defendant denies any negligence or responsibility and asserts various affirmative defenses. Schlumberger contends that Plaintiff is contractually responsible for lost equipment and tools and have counterclaimed for all sums which Plaintiff has failed to pay under the contract, including $176,000.00 claimed by STC for its equipment.[4]

Hodge requests that the Court rule as a matter of law that: (1) any provision in the contract between JPH Oil Producers and STC, which attempts to limit damages recoverable

---

[4] STC also contends that Plaintiff concealed material information concerning the density of the material that would be encountered in the well by STC and that Plaintiff understood that Plaintiff would be liable for any equipment that might become lost under the terms of the contract. See <u>Initial Pretrial Report</u> at 5 - 6 (docket # 12).  However, these and other factual issues regarding the "sidetrack" operations go to the merits of the underlying claims and need not be addressed here.

against STC is ambiguous, and as such must be interpreted against Schlumberger as the drafter of the contract; (2) any provision in the contract between JPH Oil Producers and Schlumberger, which attempts to limit the damages which can be recovered against Schlumberger is against New Mexico public policy, and as such is void and unenforceable; and (3) any provision in the contract between JPH Oil Producers and Schlumberger, which attempts to limit damages recoverable against Schlumberger is substantively unconscionable and thus unenforceable.

For the sake of clarity, and because Defendant's arguments presented in the cross-motion are essentially responsive to those issues raised in Plaintiff's motion, I address each issue in turn as raised by Plaintiff.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Roberts v. Progressive Independence, Inc., 183 F.3d 1215, 1219 (10th Cir.1999) (citation omitted).  In making a determination on a summary judgment motion, I only consider those facts which are material to the issues presented.  See Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted").

The standard for cross motions is the same as for individual motions for summary judgment. <u>Clark v. Assoc. Commercial</u>, __ F.Supp. __ (D.Kan.1994) (citing, <u>Arnold Pontiac-GMC. Inc. v. General Motors Corp.</u>, 700 F.Supp. 838, 840 (W.D. Pa. 1988)). Since both parties have moved for summary judgment on the same issues, neither party argues that a genuine issue of material fact exists. Each party's respective summary judgment motion contains a version of "undisputed" facts as well as a "response" to the other's set of "undisputed" facts, but none of these differences raise any material facts.

For example, STC objects to Plaintiff's statement of undisputed facts because Plaintiff set out only portions of the contract in the brief, thereby rendering the quoted language either inaccurate, incomplete or irrelevant. However, I find that none of the excluded language raises factual issues which would affect a determination on the discrete legal questions raised. In fact, Defendant concedes that the language cited by Plaintiff is the same in both the initial and final versions of the contract. <u>See</u>  <u>See</u>, e.g., <u>Deft's Resp. to Undisp.Facts, ¶ 5</u>. Plaintiff's responses to Schlumberger's statement of facts either highlight the purely legal issues, <u>see</u>, <u>e.g.</u>, <u>Reply, ¶¶ 4, 6, & 7</u>, or are immaterial to the legal questions here. Threshold issues such as the legal integrity of a contract provision (such as the presence of conflict or ambiguity) do not turn on whether or not Hodge ever received a second copy of the Terms and Conditions upon his request after he no longer had the initial copy. <u>See ¶ 2</u>; <u>Deft's Reply to Cross-Mot., Ex. G at 7, ¶ 2</u>.

Thus, this case turns on a question of law to be decided by the Court. However, while no genuine factual dispute exists in this case, neither the movant nor the non-movant is necessarily entitled to summary judgment unless he can show legal entitlement to victory. <u>See</u> <u>Swanson v. Fields</u>, 814 F.Supp. 1007, 1010 (D.Kan)., <u>aff'd without opinion</u>, 13 F.3d 407 (10th Cir. 1993)

(movant must also demonstrate that the applicable controlling law requires a decision in the movant's favor). Thus, because I find that no genuine issue of fact remains for the issues raised in the present motion, the critical question remains: which party's view of the contract provisions is supported by the applicable substantive law?

*I. Ambiguity in Contract Provisions*

Hodge contends that any provision in the contract between JPH Oil Producers and STC, which attempts to limit damages recoverable against STC is ambiguous, and as such must be interpreted against Schlumberger as the drafter of the contract.

Attached to STC's initial proposal to perform the directional drilling operations at Wainoco Hodge #1 was a document entitled "Terms and Conditions," which reads in relevant part,

> . . . the liability of Anadrill, however arising from, or in connection with, this Agreement (whether for breach of contract, negligence misrepresentation or otherwise), shall not in any circumstances exceed the full value of the consideration paid or payable by Customer under this Agreement prior to the date upon which the cause of such action arose. Except as expressly provided in Article 5, Anadrill shall not, in any circumstances, be liable for any consequential or indirect losses or loss of profits arising under, or in connection with this Agreement.[5]

See Pltff's' Ex. 5, Terms & Conditions, Article 4(c)(ii). The other provision is contained in the April 7, 1998 contract wherein it was agreed that Schlumberger would perform the "sidetrack" operation at the Wainoco Hodge #1 for a flat fee of $20,000.00 and which provides as follows:

> JPH Producing shall hold Anadrill/Schlumberger harmless for any event that is not a direct result of Anadrill/Schlumberger's activity, which eventually prevents Anadrill from specific performance of this contract. These include drilling rig

---

[5] "Article 5" in this provision relates to indemnity provisions for both parties. See Pltff's Ex. 5.

6

>malfunction, mishandling of equipment by rig crew of third parties resulting in equipment damage and/or fishing to retrieve equipment from the wellbore, stuck pipe caused by hole problems or caused by poor drilling fluid conditions or by anything not related to the specific activity of Anadrill/Schlumberger, or well control problems resulting in circulation of formation fluids/gas to the surface for extended periods of time.

Pltff's Ex. 6 (par.5).

Plaintiff argues that the provision limiting Schlumberger's liability in the April 7th contract is in conflict with the limiting provision in the "Terms and Conditions" of the initial bid proposal. Hodge points to the language in the "Terms and Conditions" provision which limits damages that are recoverable against Defendant regardless of the conduct alleged against STC, whereas the provision in the April 7th contract speaks to Schlumberger's liability for certain conduct without otherwise attempting to limit STC's liability either for claims arising from the conduct of its own employees, or its direct activities at the well site. Both parties agree that the two documents -- the "Terms and Conditions" and the April 7, 1998 contract -- form a single writing or contract. See Master Builders, Inc. v. Cabbell, 95 N.M. 371, 374 (Ct.App.1980) (when one or both documents refer to each other, they are construed together as one contract).[6]

Whether a written document is ambiguous is a question of law. R-G Denver Ltd. v. First City Holdings of Colo, Inc., 789 F.2d 1469, 1473 (10th Cir. 1986); Rummel v. Lexington Ins. Co., 123 N.M. 752, 758 (1997). Under well-established rules of contract interpretation, the terms of a writing are to be given their plain meaning, and ambiguities are to be construed against the drafter. RTC v. Ocotillo W. Joint Venture, 840 F.Supp. 1463, 1482 (D.N.M. 1993); Sanchez v. Herrera, 109 N.M. 155, 159, 783 P.2d 465, 469 (1989). It is only when the Court finds

---

[6] Plaintiff objected to Defendant's including this "legal argument" as one of its undisputed facts, Reply, ¶ 5, yet Plaintiff concedes its accuracy. See Mem.Brf. at 9.

7

ambiguity that the jury (or the court as the fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding issues of breach and damages. C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 509, 817 P.2d 238, 243 n. 2 (1991).

Hodge argues that Article 4(c)(ii) of the Terms and Conditions and paragraph 5 of the April 7th contract conflict with each other, contending that Article 4(c)(ii) limits liability regardless of the nature of the conduct, whereas the April 7th contract provision limits liability only for conduct not committed by Schlumberger's employee's direct activities at the well site. In other words, because Article 4(c)(ii) limits liability for all claims, but paragraph 5 allows Plaintiff to seek full damages against Schlumberger for all claims not precluded by that provision, a conflict exists.

Relying on the different tenets of New Mexico contract law, I find no conflict or ambiguity between the two provisions. As Defendant correctly points out, limitation of liability clauses (as in the Article 4(c)(ii) provision) and "hold harmless" clauses (as in paragraph 5 of the April 7th contract) have two different purposes. Under a plain reading, these purposes dovetail and are consistent within the agreement as a whole. See Bank of New Mexico v. Sholer, 102 N.M. 78, 79 (1984) (contract must be construed as a harmonious whole, and every word or phrase must be given meaning and significance according to its importance in the context of the whole contract). Looking at the two provisions as part of a whole, the language in Article 4(c)(ii) can be easily and naturally read to limit liability in terms of damages recoverable for any claims against Schlumberger that are not precluded by paragraph 5 of the April 7th contract, i.e., those arising from conduct of Schlumberger's employees and STC's direct activities at the well site.

The fatal flaw in Plaintiff's construction of paragraph 5 is that it is impermissibly premised on the *absence* of language in the provision so that nonexistent, or at best, implied, language would control express language to the contrary.  See Winrock Inn Co.v. Prudential Ins. Co. of America, 122 N.M. 562, 567 (Ct.App.1996) (when an implied term conflicts with the express terms of a contract, the implied term must fail) (citation omitted).  Plaintiff's gloss on the provision's language looks for ambiguity where there is none.  It ignores the broad language of Article 4(c)(ii) and at the same time attributes to paragraph 5 an intent which is not supported by any of its language.  See Bank of New Mexico v. Sholer, 102 N.M. 78, 79 (1984) ("This Court will not adopt an interpretation which would create conflict and ambiguity in the terms of the agreement where none previously existed").

I find instead that the express language in Article 4(c)(ii)[7] clearly reaches and controls the issue of liability in terms of degree of exposure for those claims against Schlumberger which are not precluded by paragraph 5.  The two provisions therefore do not create a conflict and are not ambiguous

## II.  *New Mexico Public Policy*

Plaintiff also contends that any provision in the contract between JPH Oil Producers and Schlumberger, which attempts to limit the damages which can be recovered against Schlumberger is against New Mexico public policy, and as such is void and unenforceable.  Plaintiff specifically refers to New Mexico's anti-indemnity statute pertaining to agreements which involve oil, gas or

---

[7] The language in Article 4(c)(ii) describes Schlumberger's liability under that provision as applying to claims "however arising from, or in conjunction with, this Agreement. . . ."

9

water wells and mineral mines. At the time the contract was formed between the parties, the statute stated that

> any agreement or contract relating to any well for oil or gas, which purports to indemnify the indemnitee against loss or liability for damages for personal injury, injury to property, or any other loss, damage or expense arising out of personal injury or injury to property. . . which arises out of the sole or concurrent negligence of the indemnitee, its agents or employees is against public policy and is thus void and unenforceable.

N.M.S.A. 1978 § 56-7-2 (Repl.1996).

Both parties base their legal arguments on Article 4(c)(ii) of the Terms and Conditions and paragraph 5 of the April 7th contract. However, because Plaintiff presents the issue in much broader terms, I mention that in addition to the two provisions discussed above, the parties' agreement also contains an indemnity clause, Pltff's Ex. 5, Art. 5, in which STC agrees to indemnify plaintiff "on account of personal injury, illness or death of any Representative [of STC] arising under this Agreement" and in which plaintiff agrees to indemnify STC "on account of personal injury, illness or death of any Representative [of plaintiff] arising under this Agreement." Art. 5(b), (e). The provision is further described therein as a "hold harmless" clause for conduct which includes concurrent acts of negligence and strict liability. Art. 5(e).

Plaintiff concedes that as a general rule, limiting provisions in a contract can be valid and enforceable, but contends that the rule does not hold true when the provision violates public policy, viz., the policy that is set forth in § 56-7-2. New Mexico case law has interpreted this anti-indemnity statute to mean "only that the indemnitee cannot contract away liability for his own percentage of negligence." Guitard v. Gulf Oil Co., 100 N.M. 358 (Ct.App. 1983), cited in Tipton v. Texaco, Inc., 103 N.M. 689, 696 (1985). Neither Article 4(c)(ii) nor paragraph 5 of the April

7th contract offers Defendant a way to sidestep liability for its own negligent conduct. Thus, § 56-7-7 does not void either contractual provision because under both provisions, Schlumberger still bears substantial responsibility for its actions even though Article 4(c)(ii) sets a limit on its exposure. See, e.g., Valhal Corp. v. Sullivan Associates, Inc., 44 F.3d 195, 202 (3rd Cir. 1995). Further, Plaintiff's concern about Schlumberger's ability to escape liability under paragraph 5 of the April 7th contract in a situation where Defendant's negligence might cause a third party's mishandling of equipment provision, is therefore unfounded because the provision does not waive Schlumberger's liability for its own negligence. Requiring parties to be responsible for their respective percentage of negligence is consistent with the safety policy behind the statute. Guitard, 100 N.M. at 358; Tipton, 103 N.M. at 696, cited in Amoco Production Co. v. Action Well Serv., 107 N.M. 208, 210 (1988).

Plaintiff also urges the Court to adopt an interpretation of the statute which would proscribe any limitation on Defendant's exposure as described in Article 4(c)(ii) of the Terms and Conditions. Defendant contends that Plaintiff overlooks the differences between types of clauses which work to avoid liability for one's own negligence (exculpatory clauses and indemnity clauses in general) and limiting provisions which set a cap on exposure, such as the one in Article 4(c)(ii).[8] Defendant maintains that § 56-7-2 focuses only on anti-indemnity statutes and that in seeking to have the statute interpreted to include limitation of liability clauses, Plaintiff attempts to impermissibly broaden the intended reach of the statute. I find that Defendant's reading of the

---

[8] Plaintiff objects to Defendant's reliance on Valhal Corp. v. Sullivan Associates, Inc., 44 F.3d 195, 202 (3rd Cir. 1995) in support of its position that the contractual positions at issue do not violate New Mexico's pubic policy considerations. Resp. to Cross-Mot. at 8. However, the case is both instructive on the distinction between the different types of clauses, and persuasive in its reasoning in finding the limitation of liability clause to be valid and enforceable.

statute is consistent with a proper and plain reading of the express language in § 56-7-2.  See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, (1980); Baty v. Willamette Ind.,172 F.3d 1232 (10th Cir. 1999) (starting point for interpreting a statute is the language of the statute itself).

Plaintiff points to one New Mexico case, see Albuquerque Tire Co., Inc. v. Mountain States Telephone & Telegraph Co., 102 N.M. 445 (1985), which seems to have treated limiting clauses and exculpatory clauses the same for purposes of determining whether such provisions violate New Mexico's public policy.  The court in that case analyzed a limitation of liability provision under a general rule which prohibits public utilities from contracting against its liability for negligence in the performance of a duty of public service.  Albuquerque Tire, at 447.  However, this Court declines to either modify or override the express language of the statute on the basis of a decision where the analysis was made without any discussion of comparison or distinction between the two types of clauses.  Moreover, the narrower interpretation of the statute furthers another New Mexico public policy - that of freedom to contract.  See Guitard, 100 N.M. at 361.

Plaintiff's efforts to void Article 4(c)(ii)'s limiting provision fare no better under the New Mexico Unfair Trade Practices Act, N.M.S.A. 1978, § 57-12-1 et seq.[9]  For one thing, as Plaintiff raises the issue for the first time in the reply in support of its summary judgment motion, it should be precluded from review.  See Codner v. United States, 17 F.3d 1331, 1332 n. 2 (10th Cir.1994).  Nevertheless, the argument does not succeed on it merits.  Plaintiff presents no New

---

[9] Plaintiff alleges violations of the New Mexico Unfair Trade Practices Act in Count IV of the Complaint.

Mexico case which addresses the issue of whether a party can contractually limit claims brought against that party under the New Mexico Unfair Trade Practices Act, nor has my research uncovered any. The New Mexico Supreme Court case upon which Plaintiff relies as a source of "guidance" not only does *not* involve a limiting clause, but also, contrary to Plaintiff's representation of the case, *did* allow proportional indemnification for amounts paid to settle claims "[t]o the extent the settlement did not include the assessment of civil penalties and [as long as the indemnitor] is responsible for the damage. . . ." Amrep Southwest v. Shollenbarger Wood Treating, Inc, 119 N.M. 542, 553 (1995).

Having determined that the limiting provision in Article 4(c)(ii) does not violate New Mexico public policy, I find that the parties were free to agree to limit Schlumberger's exposure to liability and that the provision is therefore enforceable.

### III. *Whether Provision is Unconscionable*

Plaintiff objects to any provision in the parties' contract which attempts to limit damages recoverable against Schlumberger as substantively unconscionable and thus unenforceable. A contract may be held to be unconscionable if there has been "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Guthmann v. La Vida Llena, 103 N.M. 506, 510 (1985).[10] A determination whether

---

[10] A substantive analysis of the issue is concerned with contract terms that are "illegal, contrary to public policy, or grossly unfair." Guthmann, 103 N.M. at 510. Plaintiff does not allege that any of the contract terms are illegal, and I have already determined that the provisions are not contrary to New Mexico public policy. A contract is procedurally unconscionable not merely because of inequality in bargaining power, but only where the inequality is so gross that one party's choice is effectively non-existent. Although Plaintiff presents the issue as one of substantive, not procedural, unconscionability, both inquiries require an examination of the surrounding circumstances. Id.

a contract is unconscionable is made by considering the circumstances as they existed at the time the contract was formed.

It is undisputed that at the time the contract was formed, Hodge and the other investors were familiar with the high risks of the oil and gas industry. The one investor who was not familiar with the business, a dentist, had signed an agreement acknowledging his awareness of these risks. Deft's Undisp. Mat'l Facts ¶ 3; Pltff's Reply to Undisp. Facts, ¶ 1. At the time the contract was made, Hodge had invested in oil and gas exploration since 1982 and had operated oil and gas wells in this state and in Texas since 1983. Deft's Undisp. Mat'l Facts ¶ 1. See Guthmann at 510 ("Consumers who successfully assert unconscionability usually are poor or otherwise disadvantaged . . . [f]actors to be considered include the use of sharp practices or high pressure tactics and the relative education, sophistication or wealth of the parties, as well as the relative scarcity of the subject matter of the contract.").

Plaintiff did not participate in the contract negotiations on a "take it or leave it" basis. He had a choice between competing drilling contractors for both the initial drilling operations and the "sidetrack" operations before he selected STC for the latter. Plaintiff's contentions that the contract's terms on liability are unfairly weighted in favor of Schlumberger are insufficient to show that the contract itself is unconscionable. The touchstone for substantive unconscionability is *gross* unfairness, which is not present when an experienced businessman such as Hodge comparison-shopped for drilling companies and was in a position to negotiate the terms of an agreement in a commercial field where risks for both parties are generally high. Plaintiff objects to the suggestion that Hodge modified the contract, emphasizing that Defendant drafted both the initial proposal with the Terms and Conditions and the April 7th, 1999 contract. Reply in Supp.

of Mot. for SJ, ¶ 3. Yet Hodge acknowledges that he made some changes in the agreement. Deft's Ex. A (Hodge Dep. at 137:10 - 138:21.

Plaintiff concedes that the threshold for finding a contract to be unconscionable is a high one. The facts in this case do not meet this level because they do not support a finding that Hodge lacked a meaningful choice when he entered into the agreement with Defendant, nor do they show that the contract terms are so unreasonably favorable to Schlumberger so as to be "grossly unfair." Id.

## CONCLUSION

The provisions contained in the agreement between JPH Oil Producers and Schlumberger which limit damages recoverable against Schlumberger are not ambiguous. Article 4(c)(ii) of the Terms and Conditions and paragraph 5 of the April 7, 1998 contract are not contrary to New Mexico public policy, nor are they substantively unconscionable. Based on these findings, Plaintiff's partial summary judgment is DENIED.

Accordingly, the Article 4(c)(ii) limitation of liability clause is a valid contractual provision under New Mexico law, and paragraph 5 of the April 7, 1998 contract is enforceable, thereby limiting Hodge's claims for damages to the amount of consideration paid by Hodge to Schlumberger on the date Hodge's alleged cause of action arose. Based on these findings, partial summary judgment is GRANTED to Defendant.

**WHEREFORE,**

**IT IS ORDERED** that the Motion by Plaintiff/Counter-Defendant for Partial Summary Judgment **[docket # 40]** be, and hereby is, DENIED;

**IT IS FURTHER ORDERED** that the Cross-Motion by Defendant for Partial Summary Judgment **[docket # 51]** be, and hereby is, GRANTED.

_____
UNITED STATES MAGISTRATE JUDGE